UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

BALLARD SPAHR LLP,

          Appellant,

                             Case No. 21-cv-175-pp

    v.

OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS
and GREENPOINT TACTICAL INCOME FUND LLC,

          Appellees.

**ORDER AFFIRMING BANKRUPTCY COURT'S GRANT OF SUMMARY JUDGMENT**

Law firm Ballard Spahr LLP ("Ballard") has appealed from the bankruptcy court's judgment in Case No. 19-bk-29613, in which the court granted the Official Committee of Equity Security Holders' ("the Committee") motion for summary judgment on its objection to creditor Ballard's Claim No. 98 and disallowed the claim. Dkt. No. 1. Chief Judge G. Michael Halfenger of the United States Bankruptcy Court for the Eastern District of Wisconsin granted the summary judgment motion on February 2, 2021; Ballard timely filed its notice of appeal ten days later. Id. at 1. On June 3, 2025, the court held a hearing on Ballard's appeal and affirmed the bankruptcy court's decision. This order supplements the court's ruling.

1

# I.    Factual Background

## A.    Greenpoint's Chapter 11 Filing

Appellee Greenpoint Tactical Income Fund LLC ("Greenpoint") is an investment fund focused on gem and mineral assets. R.[1] 756 at ¶1. On October 4, 2019, Greenpoint filed a Chapter 11 bankruptcy petition in the Eastern District of Wisconsin. R. 1. The schedules listed Greenpoint's twenty largest unsecured creditors; appellant Ballard was not on that list. Id. at pages 5-8. The list *did* include Chrysalis Financial LLC and Greenpoint Asset Management II ("GAM II"). Id. The corporate ownership statement required by Federal Rule of Bankruptcy Procedure 7007.1 revealed that Chrysalis and GAM II directly or indirectly owned 10% or more of Greenpoint's equity interests. R. 7.

On December 5, 2019, the U.S. Trustee filed a notice of the appointment of an official committee of equity security holders (the Committee). R. 160. On February 6, 2020, Ballard filed a proof of claim for $236,717.73. R., claims register Claim 98-1. Ballard directed that notices to the creditor should be sent to David Axelrod of Ballard Spahr. Id., part 2 at 2. The proof of claim stated that the claim was for "Services provided." Id., part 2 at 3.

## B.    The Equity Security Holders' Committee's Objection to Ballard's Claim

On September 9, 2020, the Committee filed an objection to Ballard's claim. R. 592. The Committee asserted that the claim "relate[d] to fees and

---

[1] The court has used an "R." for the record cites to the docket in bankruptcy Case No. 19-bk-29613. Any citation to "Dkt. No." refers to the docket in this district court appeal.

2

expenses incurred by Bluepoint and Michael Hull in pre-petition arbitrations rather than for services provided to" Greenpoint (the debtor). Id. at ¶1. The objection asserted that debtor Greenpoint was "controlled by its two managing members," Chrysalis and GAM II. Id. at ¶4. It explained that Christopher Nohl was the managing member of Chrysalis and that Michael Hull was the managing member of GAM II. Id. at ¶5. The objection stated that Bluepoint Investment Counsel LLC was a "former investment advisory firm owned and controlled by Hull." Id. at ¶6.

The objection explained that in 2016—before Greenpoint had filed for Chapter 11 protection—one of Greenpoint's investors had sought a redemption of his investment. Id. at ¶¶7-11. When Greenpoint could not pay, the investor began an arbitration against several people and entities, including Greenpoint, Bluepoint and Hull. Id. at ¶13. The objection asserted that "Ballard Spahr represented Bluepoint and Michael Hull in his personal capacity." Id. at ¶16. The objection alleged that Ballard also had represented Bluepoint and Hull in a 2018 arbitration started by a different set of Greenpoint investors. Id. at ¶¶22-25.

The Committee stated in its objection that it "understood" that the basis for Ballard's claim (Claim 98-1) "relates to fees and expenses incurred by Bluepoint and Hull in the arbitrations." Id. at ¶30. The Committee asserted that "Hull" and "Bluepoint" should not be allowed to use Greenpoint's assets "as their own personal piggybank to backstop their own legal responsibilities."

3

<u>Id.</u> at 2. The Committee urged the bankruptcy court to disallow Ballard's claim. <u>Id.</u>

On September 25, 2020—a little over two weeks after the Committee had filed its objection to Ballard's claim—Greenpoint filed an amended list of unsecured creditors. R. 636-1. The amended schedule listed Ballard, stating that the law firm had a claim for legal services in the amount of $23,000; in describing the debt, Greenpoint did not check the boxes next to "Contingent," "Unliquidated" or "Disputed," but did mark the box reflecting that the claim was not subject to offset. <u>Id.</u> at 2.

Ballard responded to the Committee's objection on October 23, 2020. R. 691. In the four-page response, Ballard argued that the Wisconsin LLC Act required an LLC to indemnify its members. <u>Id.</u> at ¶6. It also argued that Section 6.10(a) of Greenpoint's Second Amended and Restated Operating Agreement provided that no managing member or member would be liable to Greenpoint for damage suffered by Greenpoint on account of actions the member or managing member took believing in good faith that the action was in Greenpoint's best interests. <u>Id.</u> at ¶7. It stated that the operating agreement provided that Greenpoint was required to advance legal expenses and costs to any "indemnified person" as a result of any action under Section 6.10(a), "provided that such Indemnified Person agrees to repay such amount if it shall ultimately be determined that such Indemnified person is not entitled to be indemnified by" Greenpoint. <u>Id.</u> at ¶8. Ballard argued that Hull was the managing member of GAM II, which itself was a managing member of

4

Greenpoint; it said that "accordingly," under Wis. Stat. §183.0403, Greenpoint was obligated to indemnify Hull for his legal fees "in connection with his role," and that because he was GAM II's managing member, he was an "indemnified person" under the operating agreement. Id. at ¶9.

C.    Litigation of Ballard's Claim

On November 9, 2020, Judge Halfenger held a hearing on several claim objections, including the Committee's objection to Ballard's claim. R. 763. He ordered that no later than November 16, 2020, Ballard must file a "statement explaining the bases for its claim." Id. at 3. He set a deadline of December 1, 2020 for parties to file motions for summary judgment, with responses due by December 15 and replies by December 22. Id. Judge Halfenger stated that he'd hold a preliminary hearing on summary judgment motions on January 15, 2021, and tentatively scheduled February 18 and 19, 2021 for an evidentiary hearing on the objection. Id.

On November 16, 2020, Ballard timely filed its Statement of Claim with Respect to Claim No. 98 of Ballard Spahr LLP. R. 756. It explained that in November 2016, the SEC had started an investigation "into possible securities law violations in connection the solicitation of investments in and the operation of [Greenpoint] and certain affiliated funds . . . ." Id. at ¶4. It said that the DOJ subsequently had started a similar investigation. Id. Ballard said that among the targets of these investigations were Greenpoint, GAM II, Chrysalis, Michael Hull and Bluepoint. Id. Ballard stated, "At the time of the commencement of the DOJ investigation, Hull, on behalf of himself and Bluepoint, engaged

5

Ballard Spahr to serve as counsel in connection with such investigation." Id. at ¶5. Ballard attached to the Statement of Claim a copy of an August 2, 2017 engagement letter from attorney David Axelrod of Ballard Spahr to Michael Hull. R. 756-2. That letter—again, addressed to Hull—stated that Axelrod was "pleased to confirm your engagement of Ballard Spahr LLP . . . as legal counsel in connection with the above-referenced matter." Id. The "above-referenced matter" was listed as "Greenpoint Tactical Income Fund." Id. The letter confirmed "the terms of our agreement under which Ballard Spahr will represent you [Hull] in connection with the United States Attorney's Office's investigation related to the Greenpoint Tactical Income Fund." Id.

Ballard's Statement of Claim went on to say that subsequently two arbitration proceedings were started, "also in connection with the solicitation of investments in and the operations of" Greenpoint. Id. at ¶6. Ballard described the arbitration begun by the individual investor, and the second arbitration started by the separate set of investors, explaining that the respondents in those arbitrations "included [Greenpoint], Chrysalis, GAM, Bluepoint, Nohl, and Hull, among others." Id. It stated that "Hull and Nohl were, among other things, 'sued in the Arbitrations in their capacity as representatives of [GAM and Chrysalis].'" Id. Ballard said that Hull again had engaged Ballard on behalf of himself and Bluepoint. Id. at ¶7. It attached to the Statement of Claim a second engagement letter, dated January 26, 2018, from Axelrod to Hull. R. 756-3. This letter stated that Axelrod was "pleased to confirm your engagement of Ballard Spahr LLP . . . as legal counsel in connection with the above-

6

referenced matter." Id. The "above-referenced matter" for *this* engagement letter was listed as "Hallick Arbitration."[2] Id. The letter confirmed "the terms of our agreement under which Ballard Spahr will represent you [Hull] in connection with this Arbitration." Id.

Ballard's Statement of Claim asserted that during the two arbitrations, "Ballard Spahr managed document discovery for all respondents, worked with the expert, Duff & Phelps, on behalf of all respondents, took the lead on depositions, did the bulk of the work on the pre-trial briefing, and took the lead on negotiating and then documenting settlements of the Arbitrations." Id. at ¶8. It stated, "Although [Greenpoint] did not engage Ballard Spahr in connection with the Investigations or the Arbitrations, [Greenpoint], through its managing members, orally agreed with Ballard Spahr to pay the fees and expenses of Ballard Spahr in connection therewith." Id. at ¶9. (This was Ballard's first mention of any oral agreement; it had not mentioned such an agreement in its response to the Committee's objection to its claim.) Ballard explained that although Greenpoint had paid ten of its invoices, $236,717.73 remained unpaid. Id. at ¶¶10-11. Ballard did not attach to the Statement of Claim the actual invoices it said Greenpoint had paid; it attached a typed list of those payments. R. 756-5.

Ballard asserted that it had three grounds for its claim against Greenpoint: the Greenpoint operating agreement, Wisconsin law and the

---

[2] "Hallick" is the surname of the individual investor who sought refund of his investment and began the first arbitration.

alleged oral promise by Greenpoint to pay Ballard's fees. Id. at ¶12. It recited the language of the operating agreement and of Wis. Stat. §183.0403. Id. at ¶¶13-14. It argued that "[a]lthough nominally GAM was a managing member of [Greenpoint], GAM acted in that capacity through its own managing member, Hull, so as a practical matter, Hull himself performed the managerial function." Id. at ¶15. It asserted that both the operating agreement and Wisconsin law protected this managerial function through indemnification, "so the benefit of those provisions should flow to Hull." Id. It then said,

> Moreover, Ballard Spahr, as the law firm to whom Hull owes the fees and expenses covered by the indemnification and advancement provisions, is entitled to enforce such provisions directly against [Greenpoint], and not first look to Hull. The provisions for indemnifying and advancing fees enable indemnified parties to engage counsel, by providing assurance that counsel will be paid. To deny payment to the lawyers engaged in reliance on the indemnification and advancement provisions frustrates that purpose. The situation is analogous to permitting a tort claimant to proceed directly against a tortfeasor's insurance carrier—a right recognized under Wisconsin law. *See* Wis. Stat. §632.24. Making the claimant whole is the purpose of insurance, and similarly, assuring payment of counsel fees is the purpose of the indemnification and advancement provisions. Indeed, in cases where a corporation has an indemnification or advancement obligation to an officer or director, it is normal practice for counsel to the officer or director to submit invoices directly to the corporation, and in turn for the corporation to pay counsel directly. This is in recognition that counsel is an intended beneficiary of these types of provisions.

Id. at ¶16.

Ballard also argued that the alleged oral agreement—which it said was made "with Ballard Spahr by the managing members on behalf of [Greenpoint]"—supported its claim. Id. at ¶17. It claimed that it had performed the services it had described in reliance on that agreement. Id. It emphasized

8

that Greenpoint had "performed under" the alleged oral agreement, "making four separate payments covering ten invoices as set forth above." Id. at ¶18. And, Ballard argued, Greenpoint had "acknowledged the obligation to Ballard Spahr in its amended bankruptcy schedules, listing the Claim (in the slightly reduced amount of $230,000), without indicating that it is disputed, unliquidated, or contingent (ECF No. 636)." Id. at ¶19.

Ballard attached to the statement of claim the Second Amended and Restated Operating Agreement of Greenpoint Tactical Income Fund LLC, R. 756-2; the two engagement letters to Hull, R. 756-3 and 756-4; the typed list of invoices, R. 756-5; a document titled "Client Account Statement by Matter within Bill," listing ten bills from 2019 by David Axelrod for "Criminal and SEC Investigation" in matter number 00214123, R. 756-6; and the amended list of unsecured creditors, R. 756-7.

D.  Bankruptcy Court Summary Judgment Proceedings

On December 1, 2020, the Committee filed a motion for summary judgment on its objection to Claim No. 98, R. 794, and a supporting brief, R. 795. On December 15, 2020, Ballard filed an opposition brief. R. 841, 843-2. It attached to that brief 124 pages of documents, including the engagement letters and attached retainer agreements and the typed list of invoices. R. 843-1. Included among those documents were two checks written on the account of Greenpoint Tactical Income Fund. R. 843-1 at 121-122. The first check was dated June 15, 2018; it was made payable to "Ballard Spahr" in the amount of $7,500. The memo section of the check reads "c/o David Axelrod." The

9

signature is illegible. R. 843-1 at 121. The second check is dated November 30, 2018; it, too, is made payable to "Ballard Spahr" and is in the amount of $50,000. The memo section reads "Axelrod/Hull." The signature is illegible. R. 843-1 at 122. Ballard again attached the amended list of unsecured creditors. R. 843-3. The Committee filed a reply in support of its motion on December 22, 2020. R. 872.

On January 29, 2021, Judge Halfenger issued an oral ruling on the Committee's motion for summary judgment; he granted the motion, finding that there was no genuine dispute as to an issue of material fact surrounding Ballard Spahr's claim. R. 954.

E.      Judge Halfenger's Ruling

Judge Halfenger scheduled the January 29, 2021 hearing to rule both on the Committee's motion for summary judgment as to Ballard's claim and a different creditor's summary judgment motion. R. 954 at 7. He first addressed the Committee's motion as to Ballard's Claim No. 98. Id. at 7-8. Judge Halfenger succinctly stated the relevant facts:

> . . . Ballard Spahr, LLP, is a law firm. Ballard Spahr represented Michael Hull and Bluepoint Investment Counsel, LLC with respect to an SEC investigation, a Department of Justice investigation, and two arbitration actions. See Ballard Spahr Statement of Claim, ECF Number 756 at 1 to 3.
>
>         As the Debtor's [Greenpoint's] approved disclosure statement explains, Hull is the president and CEO of an entity that is a managing member of Debtor, Greenpoint Tactical Income Fund, LLC, ECF Number 652 at 10. Ballard Spahr filed a proof of claim for $236,717.73 in Tactical Income Fund's bankruptcy stating that the basis for the claim is for "services provided." See Claim 98-1 at 2.

The Committee objected to the claim contending that the claim is unenforceable against Tactical Income Fund because the claim is not for services provided to the fund. Ballard Spahr responded that its claim was based on contractual and statutory indemnification rights that Ballard Spahr's client Michael Hull has against Tactical Income Fund. ECF Number 691.

Id. at 8.

Judge Halfenger went on to explain that he'd required Ballard to file a statement of claim and that in that statement, Ballard had stated not only its indemnity theory, but that it had an oral agreement with Greenpoint upon which it had relied to perform legal services. Id. at 8-9. He stated that the statement of claim "alleges no other theory of relief." Id. at 9.

Judge Halfenger also recounted the details of the arbitrations for which Hull had retained Ballard. Id. at 9-10. He briefly explained the Committee's objection to Ballard's claim, concluding that that objection was

> a core bankruptcy proceeding over which [the bankruptcy court] has jurisdiction and statutory as well as constitutional authority to issue a final order. 28 U.S.C. Sections 1334 and 157(a) and (b)(2)(B) and the order of reference of the Eastern District of Wisconsin July 10, 1984 which is available on that Court's website.
>
> See also Peterson v. Somers Dublin Limited, 729 F.3d 741, 747 (7th Cir. 2013) and Katchen v. Landy, 382 U.S. 323, 329 (1966) addressing the Bankruptcy Court's claim adjudication authority under the Bankruptcy Act.

Id. at 10-11.[3]

Next, Judge Halfenger discussed the fact that bankruptcy law presumes the validity of claims. He explained that

---

[3] Ballard has not disputed the bankruptcy court's jurisdiction or authority to issue a final ruling on its motion for summary judgment.

Federal Rule of Bankruptcy Procedure 3001(f) provides that a properly-filed proof of claim entitles the claim to a presumption of validity. As a result, the Committee bears the initial burden of presenting evidence sufficient to bring the validity of Ballard Spahr's claim into reasonable dispute. See Carlson v. United States, In re Carlson, 126 F.3d 915, 921-22 (7th Cir. 1997).

As one bankruptcy court has observed: "The presumption may be rebutted by the claim objector with proof that the claim fits within one of the exceptions to the allowance of claims set forth in Section 502(b) of the Bankruptcy Code." In re Richardson, 557 B.R. 686, 689 (Bankr. E.D. Ark. 2016).

Id. at 11.

Judge Halfenger concluded that the Committee had overcome the presumption of validity as to Ballard's claim; he explained that 11 U.S.C. §502(b)(1) prohibited the bankruptcy court from allowing a claim when the claim was unenforceable against the debtor (here, Greenpoint) and the debtor's property under any applicable agreement of law. Id. at 12. He recounted that the Committee objected that Ballard had represented *Hull* and *Bluepoint* in the arbitrations, while *Greenpoint*—the debtor—had been represented by a different firm. Id. He observed that Ballard had attached no supporting documentation to its proof of claim, and that the two engagement letters from Ballard were addressed to Hull; "Ballard Spahr has no known similar agreement with [Greenpoint]." Id. Because Ballard represented Hull and Bluepoint, not Greenpoint, Judge Halfenger concluded that Ballard "appears to lack a basis to recover fees from [Greenpoint] for work performed in defense" of the SEC/DOJ investigations and the arbitrations, and that fact was "sufficient to overcome the presumption of validity afforded by Rule 3001(f)." Id.

Next, Judge Halfenger turned to the Committee's motion for summary judgment. He explained that because the Committee had rebutted the presumption of validity as to Ballard's claim, "Ballard Spahr as the claimant bears the burden of proving its claim." Id. He said, "In responding to the Committee's motion for summary judgment which asserts Ballard Spahr's lack of contract with [Greenpoint], . . . Ballard Spahr must demonstrate a triable issue of fact under Federal Rule of Civil Procedure Rule 56 of standard methodology." Id. at 13.

Judge Halfenger then laid out the familiar Fed. R. Civ. P. 56(a) summary judgment standard:

> Federal Rule of Civil Procedure 56(a) provides that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "The party pursuing the motion must make an initial showing that the agreed-upon facts support judgment in its favor." Hotel 71 Mezz Lender LLC v. The National Retirement Fund, 778 F.3d 593, 601 (7th Cir. 2015).

> The Court must "construe the evidence in the light most favorable to the non-moving party"—here Ballard Spahr—"and give that party the benefit of genuine conflicts in the evidence and all reasonable inferences." Estate of Carman v. Tinkes, 762 F.3d 565, 566 (7th Cir. 2014).

> But as the Seventh Circuit has explained: "The non-movant must not rest upon mere allegations in the pleadings or upon conclusory statements and affidavits." Warsco v. Preferred Technical Group, 258 F.3d 557, 563 (7th Cir. 2001) quoting Chemsource, Inc. v. Hub Group, Inc., 106 F.3d 1358, 1361 (7th Cir. 1997).

> To defeat a motion for summary judgment filed against a claimant: "The non-movant must show through specific [sic] evidence that a triable issue of fact remains on issues on which he bears the burden of proof at trial." Warsco, 258 F.3d 563 citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

13

Id. at 13-14.

Judge Halfenger began with Ballard's argument that Greenpoint was obligated to indemnify Hull (by advancing fees or otherwise) under Greenpoint's operating agreement and Wisconsin law. Id. at 14. Here, he made his first finding—that "[t]he relevant provisions of the operating agreement and Wisconsin law only afford indemnification rights to members or managing members." Id. He recited the language from Section 6.10(a) of Greenpoint's Second Amended and Restated Operating Agreement: "No managing member or member shall be liable to the company for any loss or damage suffered by the company on account of any action taken or omitted to be taken by the managing member or member that the managing member or member in good faith believed to be in or not opposed to the company's best interest." Id. (citing R. 795-1 at 15). He also recounted Section 6.19(b) of that agreement, which required Greenpoint to advance legal expenses and costs incurred by "indemnified" persons as a result of any action under Section 6.10(a). Id. at 14-15. Judge Halfenger observed, however, that the operating agreement did not define "indemnified person." Id. at 15. Looking at the context of the agreement, he said that the phrase "appears to refer to a person who is the subject of an action or proceeding for liability as described under Section [6.10(a)] of the operating agreement." Id.

He then recounted the language of Wis. Stat. §183.0403(2), Wisconsin's LLC statute: "A limited liability company shall indemnify or allow reasonable expenses to and pay liabilities of each member, and if management of the

14

limited liability company is vested in one or more managers, of each manager, incurred with respect to a proceeding if that member or manager was a party to the proceeding in the capacity of a member or manager." Id. He then reiterated that these provisions applied "only to managing members and members." Id.

Judge Halfenger summarized Ballard's argument this way: "Ballard Spahr . . . argues that to enforce the plain terms of the operating agreement and the statute would be to 'exalt form over substance' and 'improperly frustrate the very purpose of each.'" Id. Judge Halfenger disagreed, explaining:

> The organization of legal entities under governing law is at its essence a formal undertaking. Entities are given existence and bestowed with rights based solely on their compliance with governing statutes.
>
> Absent allegations of misusing the corporate form to commit wrongdoing which is wholly absent here, Wisconsin law looks principally to an LLC's operating agreements and Wisconsin's LLC statute to determine the rights and obligations of the LLC and its members. See generally Marx v. Morris, 925 N.W.2d 112, 199, [sic] 119-122 (Wisc. S. Ct. 2019), Gottsacker v. Monnier, 697 N.W.2d 436, 442 (Wisc. S. Ct. 2005).
>
> Ballard Spahr's indemnity and advancement arguments are thus unfounded. There is no legal basis for concluding that despite the clear and plain language of the operating agreement and Wisc. Stat. Section 183.0403(2), [Greenpoint] is obliged to indemnify Hull. Hull is not a managing member or member and, thus, he is not entitled to any rights under the agreement or statute.
>
> As a result, Ballard Spahr cannot as a matter of law state a claim against [Greenpoint] based on indemnification. This conclusion leaves no reason to address the Committee's additional argument that even if Hull has an indemnity or advancement rights, Ballard Spahr lacks standing to enforce those rights against [Greenpoint].

Id. at 16.

Judge Halfenger next turned to Ballard's argument that it had an oral agreement with Greenpoint that rendered Greenpoint directly liable to pay its claim. Id. at 16-17. Judge Halfenger explained that as evidence of this assertion, Ballard had provided attorney David Axelrod's affidavit. Id. at 17. He explained that Axelrod had attached the two engagement letters with Hull to the affidavit. Id. He quoted from the affidavit Axelrod's statement that Greenpoint, "through its managing member[s] orally agreed with Ballard Spahr to pay the fees and expenses of Ballard Spahr in connection with the proceedings," that the agreement was "not conditional" and that Ballard would not have "undertaken the engagement that it did without assurance of payment by" Greenpoint. Id. (citing R. 843-1 at 4). He quoted the Axelrod affidavit's assertion that Greenpoint had paid ten of Ballard's invoices, observing that Axelrod had attached a list of the invoices and copies of two checks from Greenpoint. Id. at 17-18. And he recounted Axelrod's assertion that Greenpoint had acknowledged an obligation to Ballard by including Ballard's claim in the amended list of unsecured creditors. Id. at 18.

In conducting his analysis of Ballard's argument, Judge Halfenger presumed "for the moment that Axelrod's statement that [Greenpoint] 'through its managing members' orally promised to pay Hull's attorney's fees is sufficient to create a triable issue of fact on the existence of an oral agreement as support for Ballard Spahr's claim." Id. But, he explained, even if there had been such an oral agreement, that presumed agreement violated the statute of frauds. After citing Wisconsin's relevant statute—Wis. Stat. §241.02(1)(b), which states

16

that "'[e]very special promise to answer for the debt of another person' is void unless it is in writing and signed by the party to be charged;"Judge Halfenger explained that the oral promise Axelrod had described in his affidavit was "a promise 'to answer for the debt of another'" under that statute. Id.

Judge Halfenger reasoned that

> [t]he Ballard Spahr engagement letters with Hull describe Hull as the only client. They refer to billing "you"—that is Hull—including for "certain expenses such as consultants, appraisers, and local counsel." The engagement letters' terms further state that Ballard Spahr will return any retainer to "you"—that is Hull—a charge "you"—that is Hull—with having agreed to pay invoices.

> They provide that Ballard Spahr is representing only Hull stating: "It is understood that Ballard Spahr's client for purposes of this representation is limited to the individual or entities specifically identified in the engagement letter and does not include others." [R.] number 843-1 at 8, 11, and 14.

> In addition, the January 26, 2018 engagement letter[] provides: "You have agreed that our representation of you in the matter described in the engagement letter does not create an attorney/client relationship with Ballard Spahr and other entities in your personal or corporate family." [R.] Number 843-1 at 18.

> Thus, only Hull owed Ballard Spahr for the invoices it provided on his behalf. If [Greenpoint] promised to pay that debt, it promised to pay the debt of another. See Mann v. Erie Manufacturing Company, Inc., 120 N.W.2d 711 (Wisc. S. Ct. 1963). See also Prize Steak Products, Inc. v. Bally Tom Foolery, Inc., 717 F.2d 367, 369-70 (7th Cir. 1983) applying Wisconsin law.

Id. at 18-19.

Judge Halfenger explained that Ballard argued that Greenpoint's alleged oral promise did not fall under the statute of frauds because that promise "was 'an original undertaking' rather than a guarantee." Id. at 19-20. He explained that Ballard relied on the Wisconsin Supreme Court's decision in Mann for the

17

proposition that "whether the promise was an original undertaking enforceable notwithstanding the Statute of Frauds or a promise to otherwise pay the debt of another made enforceable by the Statute of Frauds is a question of fact." Id. at 20. He recounted that Ballard had relied on a Wisconsin court of appeals decision, Brennan, Steil, Basting, and MacDougall, S.C. v. Colby, 525 N.W.2d 273, 273-75 (Wis. Ct. App. 1994), in asserting that Axelrod's affidavit created "a genuine issue of disputed fact about whether [Greenpoint] orally made an original undertaking rather than enforceable promise to pay the debt of another." Id. Before considering the Brennan decision, Judge Halfenger considered the Seventh Circuit's decision in Prize Steak Products. Id. He recounted that in Prize Steak, the Seventh Circuit read the Wisconsin Supreme Court's decision in Mann to hold that "the dispositive factor in determining whether an oral promise to pay the debtor [sic] of another is enforceable is 'whether it was intended to make the guarantor primarily liable for the debt of another.' 717 F.2d 369." Id. He then concluded that the Brennan decision cited by Ballard similarly had distinguished between a promise to pay someone else's debt and an original undertaking:

> The [Brennan] decision states that there is an "exception to the Statute of Frauds applicable to unconditional and independent oral promises to pay another's debt: A collateral promise to pay another's debt upon the other's breach of his or her primary promise, which the Wisconsin Supreme Court said was the type of promise to assume the debt of another that would come under the Statute of Frauds, and the promisor's own primary promise to assume the debt himself or herself which would not come within the statute. The difference between the two is the difference between a guarantee of another's debt to answer for the debt of another which is subject to the statute and an unconditional promise to pay the obligation which is not." Brennan, 525 N.W.2d 275.

18

Id. at 20-21.

Judge Halfenger concluded that Axelrod's affidavit and the other materials Ballard had provided were not sufficient to allow a reasonable person to find that Greenpoint had "made an oral original undertaking, that is an oral promise to be primarily liable for the legal services Ballard Spahr provided to Hull or Bluepoint." Id. He found Axelrod's assertions "remarkably conclusory" and "self-serving." Id. at 21-22. He found the four paragraphs of Axelrod's declaration that related to the alleged oral promise lacking in detail. Id. at 22-24. In particular, he found that the affidavit provided no evidence "showing that a person who is authorized to speak on [Greenpoint's] behalf made this promise to pay Hull's fees and Bluepoint's fees," which meant that a reasonable factfinder could not find that the oral agreement existed. Id. at 24. And he observed that Axelrod had provided almost no information about when the alleged oral agreement was made; Judge Halfenger observed that given Axelrod's "profession and interest in the matter, it is inconceivable that he does not appreciate the need for specific statements of fact about when the alleged promise was made, yet, one is left to infer the timing of the alleged promise from his other statements." Id. Judge Halfenger recounted that Axelrod's declaration had referenced an "engagement," but had not specified *which* engagement—the one referred to in the 2017 engagement letter or the one referenced in the 2018 engagement letter. Id. at 25. He observed that there was no evidence that Ballard had submitted invoices to Greenpoint, finding this a "deafening omission, particularly in light of the fact that the Committee

19

submitted copies of letters demonstrating that David Axelrod submitted invoices for legal fees incurred in the 'criminal and SEC investigation' for October 2017, April 2018, and August 2019 to Michael Hull at 'Greenpoint Asset Management.'" Id. (citing R. 795-1 at 184-200).

Judge Halfenger said that Ballard's own brief "highlight[ed] the importance of this missing evidence about the timing of the alleged oral promise" when it claimed that Axelrod's affidavit said that the alleged oral agreement was made before Ballard had done any substantial work. Id. at 26 (citing R. 843 at 15). Judge Halfenger said, "Axelrod's declaration simply does not say that. Compare [R.] Number 843 at 15 with [R.] 843-1 at paragraphs 10 to 12." Id. He characterized Ballard's argument as a "distortion of Axelrod's conclusory statements which, of course, are made under penalty of perjury," and found that distortion to "weigh[] heavily against the reasonable fact-finder's ability to find any oral promise to pay, least of all an oral promise by an individual acting on [Greenpoint's] behalf that preceded Ballard Spahr's representation of Hull and Bluepoint." Id.

Judge Halfenger acknowledged that Michael Hull was the CEO of GAM II, one of the two entities that managed Greenpoint; the second entity was Chrysalis Financial, whose managing member was Christopher Nohl. Id. He said, "[m]aybe Hull acting alone and wearing his [GAM II] hat could have made a self-dealing oral promise on behalf of [Greenpoint] to pay his debts and Bluepoint's debts." Id. But that idea caused Judge Halfenger to wonder why, if

Hull had taken that action as manager of GAM II, Axelrod had not included that fact in his affidavit. Id. at 26-27.

Despite Ballard's heavy reliance on Axelrod's affidavit, its conclusory nature and its lack of detail, Judge Halfenger found that

> [s]ome of the other allegations and facts that can be gleaned from the evidence, however, do support a conclusion that [Greenpoint] perceived an obligation, need, or benefit to paying Ballard Spahr for services it rendered to Hull and Bluepoint. Axelrod states it's a taxable income fund and the other arbitration respondents benefitted from its services—benefitted from the firm's services leading negotiations, managing document discovery, taking depositions, working with the expert, and in drafting briefing.

> And as Axelrod shows, [Greenpoint] on four separate occasions from March 29, 2018 through December 10, 2018 did pay Ballard Spahr for its work on behalf of Hull and Bluepoint. The total amount, $116,818.09, was paid using two wire transfers, March 29 and April 17, and two checks in June of 2018 and November of 2018. Axelrod doesn't provide any details about this either. The invoices aren't attached to the declaration or the prof of claim, as I mentioned, and he doesn't explain what services were invoiced.

> While incredibly vague, all of this plus the fact that [Greenpoint] scheduled Ballard Spahr as a credit, is seemingly enough barely to create a genuine issue of fact about the existence of an oral agreement between Ballard Spahr and [Greenpoint] for the payment of services on behalf of Hull and Bluepoint.

Id. at 27-28.

But that concession brought Judge Halfenger back to the question of whether the alleged oral agreement was an original undertaking—an unconditional promise to be liable for Hull's debt. Id. at 28. Judge Halfenger found that, based on Axelrod's affidavit and the other materials Ballard had provided, no reasonable factfinder could find that the alleged oral promise was an original undertaking. Id. He reiterated that Axelrod's affidavit did not

provide facts showing that the agreement "preceded or occurred simultaneously with the firm's representation, a necessary fact to show that the agreement was an original undertaking to be primarily liable for the firm's services." Id. And, he said, "[e]ven if Axelrod's statement that the firm would not have taken on the engagement 'without the assurance of payment' by [Greenpoint] is in reference to Hull's first engagement, 'without assurance of payment' is at least as consistent with a promise to guarantee payment as it is with a promise to be primarily liable." Id.

Judge Halfenger found that Axelrod's statement that the alleged oral agreement "was consistent with 'usual practice for an officer, director, or other indemnitee to submit invoices to the corporation and, in turn, for the corporation to pay counsel directly' . . . is again not support of an agreement for Greenpoint to be primarily liable." Id. at 28-29. Parsing that language, he observed that it described the "usual practice" as a practice in which an "individual client"—an officer, director or other indemnitee—was the party with primary liability, and the "indemnifying legal entity" would make the payment *on behalf of* that client. Id. at 29 (emphasis added).

Judge Halfenger reiterated that there was no evidence that Greenpoint agreed to be primarily liable for Ballard's legal fees; he again emphasized that the engagement letters were addressed only to Hull, identified Hull as the client and did not mention Greenpoint. Id. He emphasized that the retention terms incorporated into the engagement letters referred to "you"—Hull—and made no mention of anyone other than Hull being responsible for the fees. Id. at 30. As

for Greenpoint's payments of some of Ballard's fees, Judge Halfenger observed that the January 2018 engagement letter to Hull referred to a $15,000 retainer, but there was no record evidence showing that Greenpoint either was required to or did make that retainer payment. Id. at 31. He again recounted that Ballard hadn't provided the court with the actual invoices, but he presumed that the invoices were addressed to Hull because the "client account statement by matter within bill" document named Hull as the client, not Greenpoint. Id. And he could find no evidence that Greenpoint had received some independent benefit from paying Hull's and Bluepoint's fees, "a factor in the analysis under the Wisconsin Supreme Court's Mann decision, 120 N.W.2d 715." Id.

All this led Judge Halfenger to conclude that the facts of this case were "far removed" from the facts in the Brennan case relied upon by Ballard. Id. at 32. He said,

> . . . there is no basis here to infer that [Greenpoint], rather than Hull
> . . . contacted Ballard Spahr about providing Hull and Bluepoint
> with representation, that [Greenpoint] paid Ballard Spahr a retainer,
> that [Greenpoint] rather than Hull himself advised the firm about
> the circumstances of the case, that [Greenpoint] rather than Hull
> retained Ballard Spahr and directed the firm on how to conduct the
> representation, or that the firm looked to [Greenpoint] rather than
> Hull as the one making decisions about settling the dispute on Hull's
> and Bluepoint's behalf."

Id.

Judge Halfenger concluded:

> The outer boundary of reasonable inference based on the
> summary judgment record is that at some point, [Greenpoint] agreed
> to pay Hull's and Bluepoint's debts to Ballard Spahr. Taking all
> reasonable inferences in Ballard Spahr's favor, no reasonable trier
> of fact could find on this record that [Greenpoint] orally agreed to be

23

primarily liable for the legal services Ballard Spahr provided to Hull and Bluepoint.

> As a result, even if Ballard Spahr could prove that [Greenpoint] orally promised to pay Hull's debt to Ballard Spahr for the provision of legal services, that promise would as a matter of law be made unenforceable by the Statute of Frauds, Wis. Stat. 241.02(1)(b).

Id. at 32-33.

Finally, Judge Halfenger observed that for the first time in its brief in opposition to summary judgment, Ballard had argued promissory estoppel. Id. at 33. He recounted the three elements of promissory estoppel—"one, whether the promise is one on which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee; two, whether the promise induced such action or forbearance; and three, whether injustice can be avoided only by enforcement of the promise." Id. (citation omitted). Judge Halfenger pointed out that he had ordered Ballard to file "a statement explaining the bases for its claim in full." Id. at 34 (citing R. 763 at 3, 770 at 3). He emphasized that the statement of claim Ballard had (timely) filed "makes no mention o[f] promissory estoppel, nor did Ballard Spahr later amend the statement or assert promissory estoppel as a basis of its claim before responding to the Committee's motion for summary judgment." Id. at 35. Accordingly, Judge Halfenger found that Ballard had waived its promissory estoppel claim. Id.

But he went further, finding that even if Ballard had identified promissory estoppel in its statement of claim, it had not provided any "non-conclusory evidence that Ballard Spahr reasonably and detrimentally relied on

24

a promise by [Greenpoint] before undertaking representation of Hull that would support a finding of estoppel." Id. at 36. He also found that Ballard had provided no evidence that substantial injustice would occur if the bankruptcy court did not enforce the oral promise via estoppel. Id. He disputed Ballard's assertion that its only means of payment was to enforce the alleged oral agreement with Greenpoint, observing that Ballard had engagement letters with Hull, obligating Hull to pay. Id. at 36. Judge Halfenger concluded Ballard had identified no genuine dispute of a material fact as to its promissory estoppel claim. Id. at 36-37.

For these reasons, Judge Halfenger granted summary judgment in favor of the Committee, sustained the Committee's objection to Ballard's claim and stated he would issue a separate order disallowing the claim in its entirety. Id. at 37.

## II.    Legal Standard for Bankruptcy Appeals

Federal district courts have jurisdiction to hear appeals from bankruptcy court orders under 28 U.S.C. §158(a). "On appeal, the district court reviews the bankruptcy court's factual findings for clear error and its legal conclusions *de novo*." Paloian v. Grupo Serla S.A. de C.V., 433 B.R. 19, 25-26 (N.D. Ill. 2010) (citing Monarch Air Serv., Inc. v. Solow (*In re* Midway Airlines, Inc.), 383 F.3d 663, 668 (7th Cir. 2004)).

### III.   Summary Judgment

A.   <u>Standard</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u> A moving party "is 'entitled to a judgment as a matter of law'" when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Still,

> a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

<u>Id.</u> (internal quotation marks omitted).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. <u>See</u> <u>Heft v. Moore</u>, 351 F.3d 278, 282 (7th Cir. 2003) (citing <u>Liberty Lobby</u>, 477 U.S. at 255). "However, [the court's] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or

26

conjecture." <u>Fitzgerald v. Santoro</u>, 707 F.3d 725, 730 (7th Cir. 2013) (quoting <u>Harper v. C.R. Eng., Inc.</u>, 687 F.3d 297, 306 (7th Cir. 2012)). "[T]o survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in her favor." <u>Fitzgerald</u>, 707 F.3d at 730 (quoting <u>Makowski v. SmithAmundsen LLC</u>, 662 F.3d 818, 822 (7th Cir. 2011)).

B.    The Parties' Arguments

Ballard makes three arguments on appeal: First, that Greenpoint made an oral promise to pay Ballard's legal fees and expenses. Within that argument, it asserts that Greenpoint's promise to pay was unconditional, not a "guaranty" of Michael Hull's debt, and thus wasn't subject to Wisconsin's statute of frauds. It also argues that promissory estoppel bars the Committee from invoking the statute of frauds. Second, Ballard asserts that Hull is entitled to indemnification from Greenpoint under both Wisconsin law and the Operating Agreement. Third, it argues that the bankruptcy court decided disputed issues of material fact that should be decided at trial.

As to the first argument, Ballard asserts that Greenpoint orally agreed to pay Ballard for its work. Dkt. No. 6 at 12. It recounts that the Committee argued that oral agreement was unenforceable under the statute of frauds because it was "a guaranty of the obligation of another." <u>Id.</u> Ballard contends that the bankruptcy court erroneously construed the record evidence against it (rather than in the light most favorable to it as the non-moving party) and held that Greenpoint's agreement to pay was simply a guaranty of Hull's debts,

rather than a "direct obligation to pay for services rendered to a third party." Id. Ballard insists that the "uncontroverted record" demonstrated that Greenpoint had agreed to pay Ballard "directly for its legal services *regardless of whether* Hull first defaulted on his own promise to pay." Id. (emphasis in the original). It insists that an agreement of this sort isn't subject to the statute of frauds. Id.

Ballard argues that "[t]he statute of frauds only requires an agreement to be in writing if it is a promise to guaranty satisfaction of a third party debt upon the third party's default, not if it is an original undertaking to pay services rendered to another." Id. at 13. It emphasizes Wisconsin case law holding that the statute of frauds does not apply to unconditional promises that are "original undertakings" to pay for services rendered to a third party. Id. (citing Mann, 19 Wis. 2d 455, 459 (Wis. 1963). Ballard says that the court must look at several facts in determining whether an oral promise to pay is a "guaranty" or an "original undertaking": "[w]hether the promise was unconditional, when it was made, the parties' post-promise conduct, and whether the plaintiff invoked the defendant's duty to pay before any third party's default or nonperformance." Id. (citations omitted). It states that the overall focus is on "identifying whether a promise to pay the third party's debt was contingent on the third party's default or nonperformance." Id. at 14 (citing Mann, 120 N.W.2d at 715).

Ballard asserts that facts in the record demonstrate that the statute of frauds does not apply. It points to the declaration made by its attorney, David

28

Axelrod, in which Axelrod attests that Greenpoint had unconditionally agreed to pay the fees "for the legal services [Ballard] provided in connection with the investigations and arbitrations implicating [Greenpoint], Hull, and others." Id. at 14 (referencing Dkt. No. 2-2 at 355). It says that it would not have undertaken the engagement without Greenpoint's agreement to pay, and that Greenpoint not only never disputed its obligation to pay the fees but made payments on several occasions—again, citing Axelrod's affidavit. Id. at 15. It asserts that there is no evidence that Greenpoint made the payments only after Hull first failed to pay himself. Id. It says Greenpoint acknowledged its obligation to pay Ballard's fees in the amended bankruptcy schedules. Id. Ballard compares its circumstances to those in Brennan, Steil, Basting & MacDougall v. Colby, 189 Wis. 2d 344, 349 (Wis. Ct. App. 1994) and In re Sanctions in Barry Healthcare Servs., Inc. v. Eisenberg, 244 Wis. 2d 285 (Wis. Ct. App. 2001)), maintaining that those cases support its assertion that Greenpoint's offer to pay Hull's fees was not conditioned on Hull first defaulting on his own obligation. Id. at 16.

Second, Ballard argues that even if Greenpoint's oral promise to pay is the type covered by the statute of fraud, it is entitled to enforce that promise based on the doctrine of promissory estoppel. Id. Ballard argues that promissory estoppel applies "where '(1) the promise was one for which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promise; (2) the promise did induce such action or forbearance; and (3) injustice can be avoided only by

enforcement of the promise.'" Id. (quoting Champine v. Milwaukee County, 280 Wis. 2d 603, 618 (Ct. App. 2005)). Ballard says that it "adduced evidence" showing that Greenpoint should have anticipated that Ballard would rely on its agreement to pay, and that it relied on this agreement to its detriment, citing the Axelrod declaration. Id. at 16-17. Ballard asserts that "[t]his record, at a minimum creates an issue of fact as to whether Ballard can prevail on a theory of promissory estoppel, making summary judgment appropriate." Id. at 17.

Ballard recounts that the bankruptcy court concluded Ballard had forfeited its promissory estoppel argument because it didn't mention promissory estoppel in its Statement of Claim; Ballard contends that estoppel is a *defense* to the statute of frauds and thus that it was appropriate for Ballard to argue estoppel for the first time in response to the Committee's contention on summary judgment that the statute of frauds precluded its claim. Id. (citing, among others, Wamser v. Bamberger, 101 Wis. 2d 637, 639-45 (Wis. Ct. App. 1981)). It goes further, however, asserting that it did not waive (or forfeit) an estoppel argument; it says that in its Statement of Claim, it asserted that Greenpoint had agreed to pay its fees and that it had performed services for Greenpoint's benefit in reliance on that agreement. Id.  It insists that because the Statement of Claim includes these assertions, it was not required to use the words "promissory estoppel" to avoid waiving that defense. Id. at 17-18 (citing Whitehead v. AM Int'l, 860 F. Supp. 1280, 1286 (N.D. Ill. 1994)). Ballard also says that the Committee and the bankruptcy court had "ample time to consider, argue against, and rule on the claim." Id. at 18 (citing

30

<u>Dresser Indus., Inc. v. Pyrrhus AG</u>, 936 F.2d 921, 928 (7th Cir. 1991)). It says that the parties fully briefed the promissory estoppel issue, and the bankruptcy court adjudicated it, showing that there was no waiver. <u>Id.</u>

Third, Ballard argues that Hull is entitled to indemnification by Greenpoint under both Wis. Stat. §183.0403(2) and the Operating Agreement. <u>Id.</u> at 19. It provides the following facts:

> The federal government initiated investigations as to "possible securities law violations in connection with the solicitation of investments in and the operation of [Greenpoint]" and other funds. (Statement of Claim ¶¶ 4-5, App. 0393.) The two arbitration proceedings subsequently commenced also alleged claims arising from "the solicitation of investments in and the operations of [Greenpoint]." (Statement of Claim ¶ 6, App. 0393; App. 0507-608.) These proceedings implicated Hull in his capacity as a "member of manager" of GAM, which was a "member or manager" of [Greenpoint], and related to actions he allegedly did or did not take within the scope of his corporate duties as to both companies. (*See id.*)

<u>Id.</u> at 20.

Ballard says that the bankruptcy court found that Hull wasn't entitled to indemnification because he wasn't a member or manager of Greenpoint, and that both the Wisconsin indemnification statute and the Operating Agreement refer to those positions (members/managers). <u>Id.</u> Ballard says, however, that "Hull managed GAM and, in that capacity, managed [Greenpoint]." <u>Id.</u> It maintains that "[u]nder these facts, he [Hull] is precisely who the Wisconsin statute and Operating Agreement were drafted to protect." <u>Id.</u> It says that indemnification provisions are designed to "protect corporate decision makers from exposure to expense and liability," thus encouraging people to serve in decision-making capacities. <u>Id.</u> It says that that purpose is served only if the

provisions "protect the actual person performing the decision-making function and suffering losses therefrom." Id. at 21.

Ballard asserts that given this reasoning, "it would be improper to construe Section 183.0402—enacted to shield individuals from liability when acting on behalf of corporate entities—to offer no protection here to the individual who in fact managed [Greenpoint] and was subject to legal proceedings as a result." Id. It makes the same argument regarding the language of the Greenpoint operating agreement; while acknowledging that "nominally GAM was a managing member of [Greenpoint]," it says that "GAM could only act in that capacity through its own President and CEO, Hull," and that "Hull himself performed the managerial function." Id. Ballard says that it is the performance of the managerial function "that forms the basis for advancement and indemnification, whether by agreement or statute." Id. at 22.

Ballard argues that "construing Section 183.0403 and the Operating Agreement indemnification provisions to include Hull is in accord with longstanding equitable principles and common law." Id. It argues that Wisconsin law recognizes equitable indemnification. Id. (citing Estate of Kriefall v. Sizzler U.S. Franchise, Inc., 342 Wis. 2d 29, 57-58 (Wis. 2012)). Ballard argues that other jurisdictions have applied this equitable principal under similar circumstances. Id. (citing Fletcher v. A. J. Indus., Inc., 266 Cal. App. 2d 313, 327 (Cal. Ct. App. 1968)). It concludes:

> Ballard provided legal services to Hull with the concurrence of [Greenpoint] to defend against investigations and arbitrations concerning investments into and the operation of [Greenpoint]. Wisconsin law and the Operating Agreement, properly interpreted,

32

protect individuals like Hull from personal liability for the expense of legal counsel in these circumstances. [Greenpoint]—the corporate entity at the center of the legal proceedings for which Ballard was engaged—should be responsible for the fees and costs of Ballard that Hull incurred in his defense. The Bankruptcy Court's decision otherwise was incorrect, and it should be reversed.

Id. at 22-23.

Ballard argues that court should reverse the bankruptcy court's decision and allow its claim, but it says that even if the court declines to take that action, it should reverse the bankruptcy court's summary judgment ruling and remand for a "determination of the material facts that remain in dispute." Id. at 23. It maintains that the bankruptcy court "improperly assumed the role of the trier of fact, measuring the credibility and strength of the evidence, and rendered a decision on the merits of Ballard's Claim." Id.

Ballard maintains that the bankruptcy court's ruling is "replete with assessments of credibility and conclusive findings of fact." Id. at 24. It asserts that the bankruptcy court "ignored evidence of [Greenpoint's] Agreement to pay Ballard's fees and concluded that 'only Hull owed Ballard Spahr for the invoices it provided on his behalf' and that [Greenpoint's] Agreement was, therefore, to pay Hull's 'debt.'" Id. (citing dkt. no. 7-4 at 170). Ballard points to the statements in the Axelrod affidavit and "other supporting documents," which it says the bankruptcy court rejected and ignored. Id. (citing dkt. no. 7-4 at 172-175). It does not identify these "other supporting documents." Ballard argues that the bankruptcy court erred in finding that "the timing of [Greenpoint's] agreement could only be 'inferred' from the record, somehow determining this to weigh against Ballard's Claim." Id. (citing dkt. no. 7-4 at

33

172-175). It emphasizes that at summary judgment, the bankruptcy court was required to "credit" any inferences "in the manner most favorable to Ballard as the non-moving party." Id. It says that "most tellingly, the Bankruptcy Court found that the evidence 'is at least as consistent with a promise [by [Greenpoint]] to guaranty payment as it is with a promise to be primarily liable' but nevertheless adopted the former view of the facts (*i.e.*, the view less favorable to the non-movant) and concluded as a matter of law that no fact-finder could decide otherwise." Id. (citing Dkt. No. 7-4 at 179).

Ballard argues that the following material issues of fact still exist for trial:

- Whether [Greenpoint] agreed with Ballard to pay its legal fees, *Lakeside Foods, Inc. v. Liberty Mut. Fire Ins. Co.*, No. 2009AP1428, 2010 Wisc. App. LEXIS 562, at *25, 2010 WI App 120, ¶ 34, 329 Wis. 2d 270, 789 N.W.2d 754 (Wis. Ct. App. July 21, 2010) (the nature of an oral agreement "is a question for the jury");

- Whether that promise was a guaranty to satisfy any defaults on the part of Hull or an original undertaking, *Great Revers FS Coop.*, 1982 Wisc. App. LEXIS 4221, at *2 ("The existence of a special or original promise is a question of fact." (citing *Mann*, 120 N.W.2d at 714));

- Whether [Greenpoint] expected Ballard to rely on its promise to pay Ballard's fees, *U.S. Oil* [*Co., Inc. v. Midwest Auto Care Servs., Inc.*], [150 Wis. 2d 80, 89] 440 N.W.2d at 828 (calling this issue a "question[] for the fact finder"); and

- Whether Ballard reasonably relied on that oral promise when it performed legal work for [Greenpoint], *id.*; see also *W. Leather Lofts Condo. Ass'n v. Busalacchi*, No. 2009AP1451, 2010 Wisc. App. LEXIS 441, at *12, 2010 WI App 100, ¶ 22, 327 Wis. 2d 799, 788 N.W.2d 384 (Wis. Ct. App. June 15, 2010) (holding it is premature to consider the policy prong of promissory estoppel standard until "the facts in [the] case are determined by a jury").

Id. at 25. Ballard asserts that the Committee did not offer any evidence refuting "anything" in the Axelrod affidavit or the unidentified "other supporting documentation." Id. While acknowledging that the Axelrod affidavit was, essentially, its own affidavit, Ballard argues that the Seventh Circuit allows evidence in the form of a "self-interested" affidavit from a non-movant to defeat summary judgment, "especially where the testimony is based on the affiant's personal knowledge." Id. (citing Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003)).

The Committee responds that the bankruptcy court was correct in finding that Greenpoint's alleged promise to pay the fees was barred by the Wisconsin Statute of Frauds, Wis. Stat. §241.02. Dkt. No. 8 at 16-17. The Committee says that Ballard bore the burden of providing evidence that the alleged promise was an original undertaking. Id. (citing Fed. R. Civ. P. 56(c); Warsco v. Preferred Tech. Grp., 258 F.3d 557, 563 (7th Cir. 2001)).

The Committee argues that the bankruptcy court needed to consider "[t]he form of the promise, the nature of the consideration, the language of the promise used in light of the circumstances, the motive and object of making the promise, . . . as well as the timing of the promise." Id. at 17-18 (citing Mann, 19 Wis. 2d at 462; Brennan, 189 Wis. 2d at 349)). Beginning with the language and form of the promise, the Committee asserts that the Axelrod affidavit, while stating that Greenpoint had promised to pay the fees, was "silent as to whether [Greenpoint] agreed to be independently or originally liable for the debt" or which individual at Greenpoint made such an agreement

35

and when. Id. at 18. It points to Ballard's invoices, which it says identified *Hull* as the client, and argues that Greenpoint would have been the identified party and recipient of the bills had it been independently and solely responsible for the debt. Id. at 19.

The Committee also argues that the Axelrod affidavit falls short of stating that the alleged promise was unconditional. Id. It says that there is no evidence proving that Greenpoint paid all the previous bills, indicating that the alleged promise was not unconditional, because Ballard looked to other parties to pay the debt. Id. at 20.

As to timing, the Committee argues that the alleged oral promise needed to have been made before Ballard rendered its services. Id. (citing Brennan, 189 Wis. 2d at 349; Barry Healthcare, 244 Wis. 2d 285). According to the Committee, Ballard provided no evidence showing when the alleged promise was made. Id. at 21.

The Committee asserts that Ballard offered no evidence as to the motive and object of the promise or the nature of the considerations. Id. at 22-24. Regarding whether Greenpoint acknowledged its obligation to pay the fees, the Committee argues it was not enough that Greenpoint never disputed the obligation, as Ballard contends. Id. at 24. The Committee argues that the appropriate question is whether the alleged promise "was intended to make [Greenpoint] primarily liable." Id. (citing Prize Steak Products, 717 F.2d at 369. It distinguishes the facts of Ballard's cited cases from the facts of this case and

argues that the facts of this case are more like those in <u>Cook & Franke, S.C. v.</u> <u>Meilman</u>, 136 Wis. 2d 434, 435-36 (Wis. Ct. App. 1987). <u>Id.</u> at 24-25.

Second, the Committee challenges Ballard's arguments regarding promissory estoppel. The Committee asserts that Ballard failed to provide any evidence on the third element of a promissory estoppel claim. <u>Id.</u> at 27. It also argues that Ballard waived the issue on appeal, agreeing with the bankruptcy court's finding. <u>Id.</u> The Committee argues that Ballard cannot win on the merits of its promissory estoppel claim, particularly the third prong, because enforcement of the alleged promise was not Ballard's only remedy. <u>Id.</u> at 28 (citing <u>Baldwin v. Aurora Health Care, Inc.</u>, 242 Wis. 2d 471 (Wis. Ct. App. 2001)). The Committee argues that Ballard had engagement letters with Hull requiring *Hull* to pay the fees and that it has "offered no reason as to why it could not pursue those 'obvious collection rights' against Hull or how that would create a substantial injustice." <u>Id.</u> It says that Ballard failed to offer evidence in support of the first and second prong as well. <u>Id.</u> at 28-29. It argues that the Axelrod affidavit, upon which Ballard relies, is "[a] self-serving declaration from Mr. Axelrod reiterating the legal element and lacking any specific facts regarding the ways in which [Ballard] supposedly relied upon the Alleged Promise and why that reliance was reasonable." <u>Id.</u> at 29 (citing <u>Weeks</u> <u>v. Samsung Heavy Indus. Co., Ltd.</u>, 126 F.3d 926, 941-42 (7th Cir. 1997); <u>Payne</u>, 337 F.3d at 772-73)).

The Committee argues that Ballard has waived its promissory estoppel claim, because Ballard failed to raise that claim in its Statement of Claim. <u>Id.</u> It

insists that Ballard did not raise a promissory estoppel claim until the November 9, 2020 hearing on the Committee's objection, after which the bankruptcy court ordered Ballard to file a full statement of claims by the following Monday, November 16. Id. at 30 (citing dkt. no. 7 at 267-68). The Committee says that Ballard's statement of claims still did not address a promissory estoppel argument, and that Ballard did not raise such argument until it responded to the Committee's motion for summary judgment in the bankruptcy court. Id. at 31. The Committee disputes Ballard's argument that it needed only to assert promissory estoppel as a defense. Id. According to the Committee, "[p]romissory estoppel is a direct cause of action, not an affirmative defense to the statute of frauds." Id. It adds that the statute of frauds, itself, is a defense. Id. (citing Wis. Stat. §802.02(b)(3)). The Committee asserts that Ballard is confusing promissory estoppel with equitable estoppel, asserting that Ballard's cited authorities address equitable, rather than promissory, estoppel. Id. at 32. The Committees also argues that Ballard's Statement of Claim did not state sufficient facts to identify promissory estoppel. Id. at 33. It asserts that Ballard failed to include facts relating to the first and third prong of the promissory estoppel test. Id. at 34.

Third, the Committee argues that Ballard cannot bring its claim against Greenpoint based on Hull's alleged indemnification rights. Id. at 35. It argues that the Greenpoint Operating Agreement and the Wisconsin LLC Act provide indemnification only to managers, and points out that Hull was not a managing member of Greenpoint. Id. The Committee argues that there are no

38

relevant policy reasons to ignore the plain language of the Operating Agreement and Wisconsin law. Id. at 37. It argues that Ballard offered "no authority that supports a conclusion that the Wisconsin legislature or the Operating Agreement's drafters intended that the individual decision-makers of managing members be afforded the same indemnification rights as managing members themselves." Id. at 39. It asserts that the case cited by Ballard, Data Key Partners v. Permira Advisers LLC, 356 Wis. 2d 665, 690 (Wis. 2014), discusses corporations rather than LLCs. Id. at 39.

Finally, the Committee argues that the bankruptcy court did not decide any disputed issues of material fact. Id. at 40. It maintains that the bankruptcy court properly found that although there was sufficient evidence to raise a genuine dispute of material fact over the existence of an oral agreement, such an oral agreement, alone, was insufficient to survive summary judgment because it was barred by the statute of frauds. Id. at 41. The Committee asserts that the bankruptcy court appropriately found that Ballard had failed to present sufficient evidence that the alleged promise was an original undertaking. Id. (citing Ill. Conference of Teamsters and Emp'rs Welfare Fund v. Steve Gilbert Trucking, 71 F.3d 1361, 165 (7th Cir. 1995)). The Committee disputes Ballard's argument that the bankruptcy court decided issues regarding Ballard's reliance. Id. at 42. The Committee argues that the bankruptcy court was within its authority to find that there was no non-conclusory evidence that Ballard reasonably and detrimentally relied on the alleged promise. Id.

Ballard replies that the "key flaw" in the bankruptcy court's decision was the fact that it made "multiple factual determinations . . . that were undermined by a record that contains material evidence supporting Ballard's Claim." Dkt. No. 9 at 5.

Ballard then disagrees with the Committee that the standard for deciding whether the statute of frauds applies is a "mechanized . . . five-factor analysis." Id. And it says that even if it were, the statute of frauds is an affirmative defense for which the Committee bears the burden of proof. Id. It says that the Committee has produced no evidence to demonstrate that any of the five factors "favor application of the statute of frauds to bar enforcement of the Fee Agreement, let alone evidence sufficient to overcome the evidence proffered by Ballard in support of its Claim." Id. at 5-6 (citing Hotel 71 Mezz Lender, 778 F.3d at 601; Johnson v. Hix Wrecker Serv., Inc., 651 F.3d 658, 662 (7th Cir. 2011)).

Next, Ballard disagrees that it has not provided evidence in support of the application of the promissory estoppel doctrine. Id. at 6. And it argues that both corporate law and the law governing LLCs "require both LLCs and conventional corporations to indemnity their officers and managers against liability they incur in connection with their corporate roles." Id.

Ballard explains that "[w]hether the statute of frauds applies [to the oral agreement] depends upon whether [Greenpoint's] oral promise to Ballard to pay its legal fees was an 'original undertaking' (which is not covered by the statute of frauds) or was a guaranty of Hull's own obligation to pay the fees (which is

40

covered)." Id. at 7 (citing Mann, 19 Wis.2d at 459). It says that the five factors listed in Mann "are not exhaustive or rigidly applied." Id. It maintains that Wisconsin courts have taken a "holistic approach to determining whether a promise to pay for services rendered to a third party is covered by the statute of frauds." Id. at 8.

Beginning with the language and form of the promise, Ballard argues that one can infer from the facts alleged by Ballard that the oral agreement was intended to make Greenpoint primarily liable. Id. at 8. It argues that the Committee has produced no evidence showing the obligation to pay was conditioned on Hull's default; it says "the only evidence in the record is that the promise was not conditional," and it cites the Axelrod affidavit. Id. Ballard says that the "Committee's assertion that Ballard's addressing its bills to Hull is evidence that [Greenpoint] was not primarily liable overlooks that Hull functionally was one of [Greenpoint's] managers and may have receive the bills in any case." Id.

As to whether the promise was unconditional, Ballard argues that the Committee recounts that Greenpoint was not "solely" responsible for the debt and asserts that this is not relevant to whether the promise was conditional. Id. at 9. Ballard asserts that the relevant test is "whether the promise at issue was 'one to answer for the debt and default of another," rather than whether Greenpoint had sole responsibility. Id. (citing Mann, 19 Wis. 2d at 460). It says that this would include "a promiser [who] agreed to pay a third party's debt

41

*only upon that third party's default.*" Id. (citing Nelson v. Mauer,[4] 107 Wis. 2d 738 (Wis. Ct. App. 1982)) (original emphasis). Ballard reiterates that Greenpoint paid its fees from October 17 through March 2018 without predicating this action upon any other party's nonpayment, which Ballard argues "evidences that [Greenpoint's] promise to pay was, in fact, unconditional." Id.

As to timing, Ballard argues that "[u]ncontroverted testimony establishes that [Greenpoint's] promise was made 'in connection with' Ballard's engagement and that Ballard relied on the promise when deciding whether to undertake the engagement. Id. at 9-10 (citing the Axelrod affidavit). It argues that Greenpoint's payment of the ten invoices while Ballard was performing work for Hull establishes that the alleged promise was not "an after-the-fact deal made in the face of a debtor's default." Id. at 10.

As to the motive and object of the promise, Ballard argues that it has provided evidence that the work it performed for Hull benefitted Greenpoint. Id. (citing Dkt. No. 7-1 at 4—the Axelrod affidavit; Dkt. No. 7-3 at 30—the Statement of Claim). It argues that Greenpoint reasonably would want to pay for the legal representation of its manager, "as it would benefit from ensuring that its leadership could defend against investigations or litigations in which the company also was implicated." Id. It asserts that such arrangements are "commonplace." Id. (citing Dkt. No. 7-1 at 4—the Axelrod affidavit).

---

[4] This case is not available on Westlaw, but the appellant attached it to his original brief. Dkt. No. 6-1 at 35-38.

As to the nature of the consideration, Ballard argues that the record is "replete with evidence of consideration received by [Greenpoint]." Id. (citing the Statement of Claim and the Axelrod affidavit).

With respect to whether Greenpoint acknowledged an obligation to pay the fees—a factor that the Committee didn't list—Ballard again points to the invoices paid it says that Greenpoint paid on behalf of Hull. Id. at 11. It argues that it could have sought fees from Hull but did not, and characterizes this as "Ballard and [Greenpoint's] apparent shared understanding of the terms of the Fee Agreement," evidencing that the parties had had a meeting of the minds that Greenpoint would pay "even in the absence of a default by Hull." Id.

Ballard says that viewing all this evidence in its favor "compels the conclusion that the Fee Agreement was an original undertaking to pay Ballard's legal fees, and *not* merely to 'answer for the debt and default' of Hull—or at least makes that issue inappropriate for summary judgment." Id.

Ballard next argues that it offered sufficient evidence to support its promissory estoppel claim. Id. at 12. As to the first two factors, Ballard asserts that the Axelrod affidavit shows that "it would not have agreed to represent Hull absent [Greenpoint's] promise, which Ballard reasonably relied upon when rendering legal services." Id. (citing dkt. no. 7-3 at 31). It says that this is sufficient to overcome summary judgment. Id. (citing W. Leather Lofts Condo. Ass'n v. Busalacchi, 327 Wis. 2d 799, *4 (Wis. Ct. App. 2010)). It argues that, regarding the third prong, it has not been paid for the legal services, that Hull has not paid for the services and that the appropriate presumption at this

stage is that he cannot. Id. at 13. It argues that if the court affirms the grant of summary judgment, it will not be paid at all, which will work an injustice. Id. It adds that the third prong is a determination for the jury and should not be decided by the court at the summary judgment stage. Id. (citing Busalacchi, 327 Wis. 2d 799 at *4; Hoffman v. Red Owl Stores, Inc., 26 Wis. 2d 683, 701-02 (Wis. 1965)).

Finally, regarding indemnification, Ballard argues that the cases it cited discussing indemnification in the context of conventional corporations are applicable because as to indemnification, corporations are governed by statutes just the same as LLCs. Id. at 14 (citing Marx v. Morris, 386 Wis. 2d 122, 146-47 (Wis. 2019); Data Key, 356 Wis. 2d at 690). Conceding that the applicable statutes might be different, Ballard nonetheless argues that both corporate and LLC statutes "encourage or require indemnification for officers and managers." Id. It repeats that "[i]nterpreting the indemnification provisions of either the [Greenpoint] Operating Agreement or the Wisconsin LLC Act to carve out Hull—who the Committee effectively concedes was functionally the manager of [Greenpoint] . . . would be contrary to the intent of each and lead to an outcome that would undermine each provision's purpose." Id.

C.    Analysis

1.    *Statute of Frauds*

The court first considers whether Judge Halfenger erred in concluding that there was no genuine dispute of material fact over whether Greenpoint's alleged oral promise to pay Ballard Spahr is barred by the statute of frauds.

44

Under Wis. Stat. §241.02, Wisconsin's statute of frauds, "every agreement shall be void unless such agreement or some note or memorandum thereof, expressing the consideration, be in writing and subscribed by the party charged therewith: . . . (b) [e]very special promise to answer for the debt, default or miscarriage of another person." "Wisconsin case law draws a distinction between a collateral promise, which falls within the statute of frauds, and an original undertaking, which does not." Barry Healthcare, 244 Wis. 2d 285 at *4 (citing Mann, 19 Wis. 2d at 458). An "original undertaking" is "a synonym for an absolute and unconditional promise." Mann, 19 Wis.2d at 459 (citation omitted).

"[W]hether a promise to pay the debt of another is primary on the part of the promisor or merely collateral to that of the debtor is a 'question [] of fact.'" Brennan, 189 Wis. 2d at 349 (quoting Mann, 19 Wis. 2d at 459). The essential question before Judge Halfenger was whether, assuming for the sake of argument that an oral agreement existed between Ballard and Greenpoint, that oral agreement was an "original undertaking"—an absolute and unconditional promise—or a "collateral promise," also called a guaranty. Again, an oral agreement for an original undertaking (an absolute and unconditional promise) is *not* barred by the statute of frauds, while a guaranty *is* barred. In deciding whether a promise is an original undertaking or a guaranty, a court must consider "[t]he form of the promise, the nature of the consideration, the language of the promise used in light of the circumstances, [and] the motive and object of making the promise," Mann, 19 Wis. 2d at 462, as well as the

45

timing of the promise, <u>Brennan</u>, 189 Wis. 2d at 349, and the parties post-promise conduct, <u>Great Rivers v. Backman</u>, 109 Wis. 2d 697 (Wis. Ct. App. 1982)). The court should consider these factors, but they "do not automatically determine" the nature of the promise. <u>Id.</u>

Under Wisconsin law, "'[w]hen the statute of frauds has been raised as an affirmative defense, the burden is on the party seeking to enforce the contract to show facts which take the case out of the statute of frauds.'" <u>Budgetel Inns v. Micros Sys.</u>, Case No. 97-CV-301, 2002 WL 32123532, *31 (E.D. Wis. Jan. 30, 2002) (quoting <u>Superview Network, Inc. v. Superamerica</u>, 827 F. Supp. 1392, 1397 (E.D. Wis. 1993)). To survive summary judgment, Ballard—the party seeking to enforce the alleged oral contract—must have provided Judge Halfenger with evidence raising a genuine issue of material fact regarding whether the alleged oral promise was a promise collateral to Hull's promise to pay, or an absolute, unconditional promise to pay regardless of whether Hull paid. <u>Id.</u> ("[W]hen the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict.") (citing <u>Liberty Lobby</u>, 477 U.S. at 248).

In its arguments to Judge Halfenger, Ballard relied heavily—almost exclusively—on Axelrod's affidavit. So it is important to look at the language of that affidavit relevant to the nature of the oral promise. The affidavit is at Dkt. No. 2-2; the relevant paragraphs are paragraphs 10 through 13. Those paragraphs state:

10.    In connection with Ballard Spahr's engagement, [Greenpoint], through its managing members, orally agreed with Ballard Spahr to pay the fees and expenses of Ballard Spahr in connection with the Proceedings (the "Fee Agreement"). The agreement was not conditional. Ballard Spahr would not have undertaken the engagement it did without assurance of payment by [Greenpoint].

11.    The Fee Agreement was consistent with the usual practice, as it is typical in cases where a company has an advancement or indemnification obligation to an officer, director, or other indemnitee for the officer, director, or other indemnitee to submit invoices to the corporation, and in turn for the company to pay counsel directly.

12.    In performing services, including those for the benefit of all respondents in the Proceedings, including [Greenpoint], Ballard Spahr acted in reasonable reliance on [Greenpoint's] fee agreement.

13.    Further, [Greenpoint] paid ten of Ballard Spahr's invoices in connection with the Fee Agreement. A summary of the invoices paid by [Greenpoint] and copies of two checks from [Greenpoint] are attached hereto as Exhibit G. [Greenpoint] also acknowledge the obligation to pay the invoices on its Schedules.

Dkt. No. 2-2 at 357.

Judge Halfenger concluded that this language "and other materials Ballard Spahr has submitted are insufficient to show a basis from which a reasonable person could find that [Greenpoint] made an oral original undertaking, that is an oral promise to be primary liable for the legal services Ballard Spahr provided to Hull . . . ." R. 954 at 21. First, Judge Halfenger found Axelrod's statements "remarkably conclusory." Id. the Seventh Circuit has emphasized in several cases that "a nonmoving party at the summary judgment stage cannot rest 'upon conclusory statements in affidavits; [they] must go beyond the pleadings and support [their] contentions with proper documentary evidence." Foster v. PNC Bank, National Association, 52 F.4th 315, 320 (7th Cir. 2022) (quoting Weaver v. Champion Petfoods USA Inc., 3

47

F.4th 927, 934 (7th Cir. 2021)). Axelrod made broad, conclusory statements such as "the agreement was not conditional" and the agreement was "consistent with usual practice." Judge Halfenger did not commit clear error in finding these statements conclusory, nor did he err in determining from a legal standpoint that such conclusory assertions are not sufficient to defeat summary judgment.

Next, Judge Halfenger found that Axelrod's affidavit was self-serving. R. 954 at 22. The Seventh Circuit has held explained that "[d]eposition testimony, affidavits, responses to interrogatories, and other written statements by their nature are self-serving." Hill v. Tangherlini, 724 F.3d 965, 967 (7th Cir. 2013) (citation omitted). It has "repeatedly emphasized" that "the term 'selfserving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment." Id. "A non-moving party's own affidavit can indeed be a 'legitimate method of introducing facts on summary judgment.'" Foster, 52 F.4th at 320 (quoting McKinney v. Office of Sheriff of Whitley Cnty., 866 F.3d 803, 814 (7th Cir. 2017). And "[e]vidence 'presented in a "self-serving" affidavit or deposition is enough to thwart a summary judgment motion,' unless it fails to meet the usual requirements of any other form of evidence at the summary judgment stage." Id. (citing Kellar v. Summit Seating, Inc., 664 F.3d 169, 175 (7th Cir. 2011)).

In finding Axelrod's affidavit "self-serving," Judge Halfenger cited the case the Committee has cited to this court: Weeks v. Samsung Heavy Indus. Co., Ltd., 126 F.3d 926, 941-42 (7th Cir. 1997). But the Seventh Circuit decided

Weeks in 1997. Six years later, in 2003, the Seventh Circuit clarified a line of its decisions—including Weeks—that repeatedly had been interpreted to hold that a self-serving affidavit could not defeat summary judgment. In Payne v. Pauley, 337 F.3d 767, 772 (7th Cir. 2003), the court addressed the defendant's argument that multiple Seventh Circuit cases—including Weeks—stood "for the proposition that self-serving, uncorroborated, and conclusory statements in testimony are insufficient to defeat a motion for summary judgment." Id. (cited cases omitted). The court explained:

> It is not the self-serving nature of the affidavits, however, that sealed their fate in these cases. After all, most affidavits submitted for these purposes are self-serving. Instead, these affidavits fail to thwart summary judgment because they are not based on personal knowledge as required by both the Federal Rule of Civil Procedure on summary judgment, Rule 56(e) ("[s]upporting and opposing affidavits shall be made on personal knowledge"), and by Federal Rule of Evidence 602 ("A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.") Furthermore, although personal knowledge may include reasonable inferences, those inferences must be "grounded in observation or other first-hand experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience." Visser v. Packer Eng'g Assoc., 924 F.2d 655, 659 (7th Cir. 1991) (en banc).

Id.

Ten years later, in Hill, the court put a finer point on it. Conceding that its use of the term "self-serving" had been "imprecise," and perhaps had muddied the waters, it stated, "today we make clear that the following cases are overruled to the extent that they suggest that a plaintiff may not rely on 'self-serving' evidence to create a material factual dispute." Hill, 724 F.3d at 967 n.1 (listing a non-inclusive list of cases dating from 1992 through 2011).

49

As the Payne court said, "[p]rovided that the evidence meets the usual requirements for evidence presented on summary judgment—including the requirements that it be based on personal knowledge and that it set forth specific facts showing that there is a genuine issue for trial—a self-serving affidavit is an acceptable method for a non-moving party to present evidence of disputed material facts." Payne, 337 F.3d at 773.

Considering Judge Halfenger's references to the "self-serving" nature of Axelrod's affidavit in the context of the full decision, the court must conclude that Judge Halfenger did not reject Axelrod's affidavit solely because it was "self-serving," nor did he reject it because he did not think Axelrod had personal knowledge of the information in the affidavit. As Judge Halfenger observed, Axelrod certainly was a person with "personal knowledge of the matter" as required by Rule 56(e) and Rule 602—he sent both the 2017 and 2018 engagement letter to Hull, he was listed as the biller on the firm's billing records, his name was in the memo section of one of the two checks. Judge Halfenger rejected the affidavit because despite Axelrod's personal knowledge, the affidavit does not, in the words of the Payne decision, "set forth specific facts showing that there is a genuine issue for trial" regarding whether the alleged oral promise was an unconditional "original undertaking" or simply a conditional guarantee of Hull's debt.

After citing Weeks, Judge Halfenger quoted the portion of the Axelrod affidavit that described the alleged oral promise. He discussed the complete lack of detail surrounding the alleged oral promise—the absence of information

50

about who made the promise, to whom, when, whether the person who made the alleged promise had authority to bind Greenpoint. Although Axelrod had averred that Greenpoint made the oral agreement "through its managing members," Judge Halfenger pointed out that the managing members were entities whom Axelrod either should have known or knew, yet his affidavit did not identify who made the alleged promise. He pointed out the absence of any evidence that whoever allegedly made the promise on behalf of Greenpoint had the authority to do so. He pointed out that not only did Axelrod fail to state when the alleged oral agreement was made, but that he failed to explain which "engagement"—the SEC/DOJ investigations or the arbitrations commenced by investors—Greenpoint allegedly had retained Ballard for. He recounted that Axelrod hadn't provided the invoices, so there was no evidence that it had sent those invoices to Greenpoint.

This court would go further. Axelrod knew and had interacted with Michael Hull. If Hull was the person who made an oral promise for Greenpoint to pay Ballard's legal fees, Axelrod would have known that and would have had the personal knowledge to state it in his affidavit. He didn't. If he had such a conversation with Hull—or if someone else at the firm had such a conversation—Axelrod would have known roughly when that conversation took place and would have had the personal knowledge to put that information in his affidavit. He didn't. Axelrod would have known, or been able to find out, who at Ballard accepted the offer to have Greenpoint pay the legal feels and would have had the personal knowledge to put that information his affidavit.

51

He didn't. <u>Mann</u> requires the court to look at the form of the promise—in this case, unconditional (original undertaking) or conditional on Hull's failure to pay (guaranty/collateral promise). Axelrod would have known or been able to find out whether whoever made the promise on Greenpoint's behalf agreed unconditionally to pay Ballard's legal feels, or whether they agreed only to pay the fees in the event that Hull/Bluepoint didn't pay. Axelrod did not put that information in the affidavit.

Further, Greenpoint had *two* members—GAM II (of which Hull was the managing member) and Chrysalis (of which Nohl was the managing member). Even assuming that Axelrod/Ballard had some agreement with *Hull*, Hull was the managing member of only *one* of Greenpoint's members. The 2017 and 2018 engagement letters were from Axelrod to *Hull*. Axelrod did not provide Judge Halfenger with engagement letters, retainer agreements or other written documentation between Ballard and *Chrysalis/Nohl*. There is no evidence that *Chrysalis/Nohl* agreed to retain Ballard, either to represent Chrysalis/Nohl *or* to represent Greenpoint. Even assuming that there was an oral agreement between Axelrod and Hull (or some other lawyer at Ballard and Hull) for Ballard to represent Greenpoint, there is no evidence that Hull/GAM II had the authority to bind Greenpoint without the agreement of Chrysalis/Nohl.

<u>Mann</u> requires the court to consider the motive and object of making the promise. One might assume that Ballard's motive in entering into the alleged oral agreement was to get paid—perhaps it felt that Greenpoint was a deeper pocket than Hull, or a more reliable source of funds. But that is speculation—

52

Axelrod's affidavit does not say that. It is difficult even for the court to speculate on Greenpoint's motive or object in promising to pay Hull's legal fees, particularly because again, Hull was not a member of Greenpoint and was a managing member of only one of Greenpoint's two member entities.

Axelrod avers that Ballard performed several types of work on behalf of "all respondents"—managing document discovery, working with the expert, taking the lead on depositions, working on pre-hearing briefing and negotiating arbitration settlements. Dkt. No. 7-3 at 30. Drawing all inferences in favor of Ballard, the court must accept those assertions as true. But because Axelrod did not explain *when* the alleged agreement was made, the court cannot conclude that Greenpoint's motive or object in allegedly promising to pay Ballard included the understanding that Ballard would be performing these types of legal services on its behalf.

Ballard questions why Judge Halfenger was concerned with when the alleged oral agreement was reached. But it was *Ballard* who cited the <u>Brennan</u> decision, and <u>Brennan</u> instructs that in deciding whether the promise was an original undertaking or a guarantee, the court should consider the timing of the promise. <u>Brennan</u>, 189 Wis. 2d at 349. Ballard insists that Judge Halfenger was required to view the evidence in the light most favorable to it, and that if he'd done so, he would have concluded that Axelrod's statement in the affidavit that "Ballard Spahr would not have undertaken the engagement it did without assurance of payment by [Greenpoint]" gave rise to an inference that the oral agreement pre-dated Ballard's performance of any legal services. Ballard makes

53

much of Judge Halfenger's assertion that that statement by Axelrod was "at least as consistent with a promise to guarantee payment as it is with a promise to be primarily liable."

Even had Judge Halfenger drawn all inferences from Axelrod's statement in the light most favorable to Ballard, that statement does not answer the question of when the promise was made. At best, it shows that Ballard would not have "undertaken"—agreed to? started working on?—some unidentified "engagement"—defending Hull/Bluepoint in the SEC investigation? The DOJ investigation? The Hallick arbitration? The second arbitration? All four?— without some "assurance" of payment by Greenpoint. This statement, even viewed in the light most favorable to Ballard, does not place the alleged oral promise in time. Considered with the fact that there is no evidence of who made the oral agreement, when it was made or what its terms were, a loose implication that Ballard wouldn't have either agreed to perform or started performing some unspecified work if it did not have some assurance of payment by Greenpoint does not suffice to prove that there was an unconditional oral agreement between Ballard and someone with authority to bind Greenpoint for Greenpoint to pay Ballard's legal fees—not even when viewed in the light most favorable to Ballard.

Ballard asserts repeatedly that in rejecting its "evidence"—particularly the Axelrod affidavit—Judge Halfenger made credibility determinations, weighed evidence and resolved factual disputes. "[C]ourts are allowed to find affidavits and other forms of evidence as insufficient or conclusory as a legal

54

matter at the summary judgment stage; that is not an impermissible credibility determination." <u>Foster</u>, 52 F.4th at 320 (citation omitted). And the transcript of the oral ruling does not support Ballard's allegations. What Judge Halfenger's ruling and the record itself show is a marked absence of evidence supporting Ballard's claim that the oral agreement was an unconditional promise for *Greenpoint* to pay for legal services performed by Ballard for Hull (or for anyone else).

The Seventh Circuit famously has said that "[s]ummary judgment is the 'put up or shut up' time in litigation." <u>Brown v. CACH, LLC</u>, 94 F.4th 665, 667 (7th Cir. 2024) (citation omitted) (among other cases). It was Ballard's obligation to "put up" sufficient evidence to show not only that Greenpoint perhaps felt some obligation to pay Ballard's invoices, but that Greenpoint made an unconditional oral agreement to do so. As Judge Halfenger said, the Axelrod affidavit—really the only evidence relating to the nature of the oral agreement—"lacks any specific facts from which one could find that the alleged oral agreement preceded or occurred simultaneously with the firm's representation, a necessary fact to show that the agreement as an original undertaking to be primarily liable for the firm's services." R. 954 at 28.

Despite Ballard's arguments, the record shows that Ballard has not "put up" sufficient evidence to create a genuine issue of fact regarding whether Greenpoint entered into an unconditional agreement to pay any fees Ballard incurred, regardless of whether Hull first defaulted. *That* is why Judge Halfenger concluded that any oral promise—even if it existed—was rendered

55

unenforceable by the statute of frauds. He did not reach that decision by making improper credibility determinations, or weighing evidence, or resolving factual disputes. He reached that conclusion because Ballard did not "put up" evidence sufficient to demonstrate that there was a genuine issue of material fact to be decided by a trier of fact.

Judge Halfenger's factual conclusions were not clearly erroneous, nor were his ultimate legal conclusions erroneous. The court will not reverse his ruling regarding the statute of frauds barring any oral promise.

### 2.    *Promissory Estoppel*

"Promissory estoppel has three elements: (1) the promise was one for which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee; (2) the promise did induce such action or forbearance; and (3) injustice can be avoided only by enforcement of the promise." Kelly v. Cole, 379 Wis. 2d 368, *5 (Wis. Ct. App. 2017) (citing Hoffman, 26 Wis. 2d at 698).

Judge Halfenger concluded that Ballard had waived its opportunity to raise an estoppel argument. After the plaintiff first argued at a hearing that Greenpoint orally had agreed to pay its fees, Judge Halfenger ordered Ballard to "file a full statement of all bases for the claims by no later than Monday, November 16th, [2020]." Dkt. No. 7 at 264. Ballard did so, listing three bases for its claim: "the Operating Agreement, Wisconsin law, and an oral promise of GTIF to pay [the appellant's] fees." Dkt. No. 7-1 at 4. "Wisconsin law" appears to refer to the Wisconsin LLC statute, Wis. Stat. §183.0403. None of these

56

bases mentions promissory estoppel. As Judge Halfenger pointed out, Ballard didn't later amend the statement of claim or in any way assert promissory estoppel before it filed its brief in opposition to summary judgment.

At the June 3, 2025 hearing, the court advised the parties that it would be issuing a written decision affirming the bankruptcy court's grant of summary judgment to the Committee. It gave the parties a preview of the reasoning contained in this written decision. At that time, the court told the parties that Ballard had not properly pled promissory estoppel as required by law. In reviewing and editing its draft decision, the court has modified that conclusion.

The court understands Ballard's assertion that it had no need to argue promissory estoppel until it learned that the Committee was raising the statute of frauds defense to its claim that it had an oral agreement. The Committee raised that statute of frauds defense for the first time in its brief in support of summary judgment. To some extent, this is a chicken/egg argument; the first time Ballard alleged that it had an oral agreement with Greenpoint was in its statement of claim, so the Committee could not have raised the statute-of-frauds defense until its summary judgment brief.

Given that procedural posture, and assuming for the sake of argument that Judge Halfenger's conclusion that Ballard waived the promissory estoppel argument by failing to raise it in the statement of claim may have constituted error, Judge Halfenger also concluded that even if Ballard hadn't waived the promissory estoppel claim, it had not proven the elements of promissory

57

estoppel. He reiterated that there was no evidence that Ballard had reasonably, and to its detriment, relied on a promise made by Greenpoint *before* it started working on Hull's behalf. Judge Halfenger also found that Ballard had not proven that the bankruptcy court's failure to enforce the oral promise through estoppel would work a substantial injustice, observing that Ballard *did* have a written agreement with *Hull*, from whom it could seek to collect its fees. Ballard has responded that Hull hasn't paid, which it infers means that he can't, and it maintains that its failure to get paid at all would work an injustice.

First, Ballard's argument that Hull has not paid the outstanding balance on the invoices and likely can't possibly contradicts its argument that the alleged oral promise was unconditional and not a guarantee. The argument implies that Ballard unsuccessfully has sought payment from Hull. If it sought payment from Hull *before* seeking payment from Greenpoint (and the court cannot know whether that happened, because Ballard didn't provide the invoices), that would give rise to an inference that Greenpoint's agreement to pay (if there was one) was conditioned on Hull's failure to pay.

Setting that conundrum aside, the court turns to the fact that Ballard cited seven pages of the Wisconsin Court of Appeals decision in Wamser in support of its argument that because promissory estoppel is a defense to the statute of frauds, it was not required to raise it before the Committee made its statute-of-frauds argument in its summary judgment brief. Most of these pages have nothing to do with promissory estoppel. But the pages that *do* relate to estoppel imply that promissory estoppel applies in the context of a statute-of-

58

frauds defense when the party asserting estoppel shows that it relied on a representation by the other side that it wasn't necessary to put the deal in writing.

First, the <u>Wamser</u> court listed the following four elements of equitable estoppel:

(a) A promise;

(b) which the promisor should reasonably expect to induce action or forbearance on the part of the promise;

(c) and which does induce such action or forbearance;

(d) is enforceable notwithstanding the statute of frauds if injustice can be avoided only by enforcement of the promise.

<u>Wamser</u>, 101 Wis.2d at 642. It then went on to the following discussion:

> The trial court properly concluded that even when the facts were viewed in the light most favorable to Wamser, estoppel was inapplicable to the facts of this case. Wamser argued that Bamberger should be estopped from asserting the defense of the statute of frauds because Wamser relied to his detriment upon Bamberg's representing that nothing need be done to bind the deal. Assuming Bamberger did tell Wamser that the deal need not be put in writing and that no money need change hands to guarantee performance and Wamser relied on those statements, the fact that Wamser lost the benefit of the bargain by his reliance upon such representations would not work to estop Bamberger from asserting the statute of frauds defense.

> The mere statement by a party to an oral agreement that no formalities need be executed to bind the deal does not invoke estoppel. 73 Am. Jur. 2d Statute of Frauds s567 (1974), discusses this concept as follows:

>> Neither does an estoppel arise upon the mere refusal to make a writing as agreed. Where the entire transaction leading up to the making of the verbal contract is open and free from fraud or false representation, the subsequent failure to carry out that

contract cannot of itself constitute an estoppel; otherwise the court would open the door to the nullification of the statute of frauds.

If every party making a claim based upon an oral agreement could evade the statute of frauds by simply claiming a breach of a promise to preserve the deal without putting anything in writing or transferring money, the statute of frauds would be far too easily defeated. The trial court recognized this fact when it pointed out:

The theory propounded by counsel for the plaintiff would be tantamount to ceaseless and protracted litigation and defeat the very purpose of the statute, in effect, anytime that you claimed that there was a promise to enter into a written agreement that you could defeat the statute. That is not the intent of either the Court or the legislature.

Id. at 643-44.

The promissory estoppel argument Ballard has made is *not* that Greenpoint somehow convinced Ballard not to put Greenpoint's agreement to pay Ballard's fees in writing. In fact, Ballard has not explained why, if it had an agreement with Greenpoint for Greenpoint to pay its fees, it did not put that agreement in writing. It put its agreements with *Hull* in writing. It is a law firm; it likely puts its agreements with other clients in writing. Ballard seems to argue that even though it did not do what presumably it routinely does with other clients and reduce its alleged agreement with Greenpoint to writing as required by the statute of frauds, the bankruptcy court should have enforced the oral agreement because Ballard relied on the agreement to its detriment.

That argument depends, almost entirely, on proof that the bankruptcy court's failure to enforce the alleged oral agreement would constitute an

60

injustice. Ballard argues that this is a question of fact, citing <u>Hoffman v. Red Owl Stores, Inc.</u>, 26 Wis. 2d 683 (Wis. 1965). Ballard is incorrect.

In <u>Red Owl</u>, the Wisconsin Supreme Court stated that the third element—"that the [promissory estoppel] remedy can only be invoked where necessary to avoid injustice"—"is one that involves a policy decision by the court." <u>Id.</u> at 698. The Seventh Circuit has reiterated that the third element of promissory estoppel is "a question of law." <u>C.G. Schmidt, Inc. v. Permasteelisa North America</u>, 825 F.3d 801, 807 (7th Cir. 2016) (citing <u>Red Owl</u>, 133 N.W.2d at 275). And it has emphasized that "promissory estoppel is only available in 'limited circumstances' and does not allow 'circumvention of carefully designed rules of contract law.'" <u>Id.</u> (quoting <u>All-Tech Telecom, Inc. v. Amway Corp.</u>, 174 F.3d 862, 869 (7th Cir. 1999)). Presumably that also includes carefully designed statutes of fraud.

Judge Halfenger did not err in concluding that Ballard has not demonstrated that the bankruptcy court's failure to enforce the alleged oral contract via promissory estoppel would work an injustice. For the reasons he, and this court, explained, Ballard has not identified sufficient evidence to raise a genuine issue of fact over whether Ballard and Greenpoint had an unconditional agreement for Greenpoint to pay Ballard's fees. Ballard *did* have a written agreement with Hull, and if it did not seek payment under that agreement, it hasn't explained why. Although Judge Halfenger did not say it, Ballard also has not explained why it did not reduce its alleged oral agreement with Greenpoint to writing as required by the statue of frauds, and as it did

with Hull. The court cannot conclude that failure to enforce an oral agreement works an injustice on Ballard when Ballard has not explained why it did not protect itself via a written agreement, whether it has attempted to collect from Hull and if not, why. Although it is "unfair" in a universal sense for a party who performed honest work not to get paid for doing so by someone who agreed to pay, that universal "unfairness" is not an "injustice" creating the kind of limited circumstance that warrants application of promissory estoppel. The court will not reverse Judge Halfenger's promissory estoppel ruling.

      3.    *Indemnification*

Finally, Ballard asserts that Hull is entitled to indemnification from Greenpoint for his legal fees under both Wisconsin law and the Operating Agreement. Dkt. No. 6 at 19.

> Wisconsin law requires LLCs to
>
> indemnify or allow reasonable expenses to and pay liabilities of each member and, if management of the limited liability company is vested in one or more managers, of each manager, incurred with respect to a proceeding if that member or manager was a party to the proceeding in the capacity of a member or manager.

Wis. Stat. §183.0403(2). Greenpoint's Operating Agreement states:

> Advancement of Fees: [Greenpoint] shall advance legal expenses and other costs incurred by any such Indemnified Person as a result of any such action or proceeding under Section 6.10(a), provided that such Indemnified Person agrees to repay such amount if it shall ultimately be determined that such Indemnified Person is not entitled to be indemnified by [Greenpoint]."

Dkt. No. 7-1 at 19. As Judge Halfenger observed, the operating agreement does not define "indemnified person," but the "such" appears to refer to a managing member of member of Greenpoint who has taken any action taken, or omitted

62

taking action, that the managing member or member in good faith believed to be in or not opposed to the company's best interest, under Section 6.10(a) of the agreement.

Judge Halfenger found that Hull was not a "member or manager" of Greenpoint, and therefore was not entitled to indemnification under either Wisconsin's LLC statute or Greenpoint's operating agreement.

On appeal, Ballard asserts that the SEC/DOJ investigations and the arbitrations "implicated Hull in his capacity as a 'member or manager' of GAM, which was a 'member or manager' of [Greenpoint], and related to actions he allegedly did or did not take within the scope of his corporate duties as to both companies." Dkt. No. 6 at 20. Ballard concedes that Judge Halfenger found Hull wasn't a "member or manager" of Greenpoint, but says, "[n]evertheless, Hull managed GAM and, in that capacity, managed [Greenpoint]." Id. Ballard argues that "[u]nder these facts," Hull is "precisely" the person the Wisconsin LLC statute and the Greenpoint operating agreement "were drafted to protect." Id. And it argues that Hull is entitled to equitable indemnity. Id. at 22-23.

Judge Halfenger did not err—factually or legally—in finding that there was no genuine issue of material fact regarding whether Hull was entitled to indemnification. He correctly observed that the Wisconsin LLC statute mandates indemnification for members or managers of an LLC. He also correctly observed that there is no evidence in the record that Michael Hull was a member or manager of *Greenpoint*, the LLC from whom Ballard claims Hull was entitled to indemnification. As the court repeatedly has stated, Hull was

63

the managing member of *GAM II*, one of the two managing member entities of Greenpoint. Wisconsin law would have entitled Hull to indemnification by *GAM II*, because he was a member/manager of GAM II. But it did not entitle him to indemnification by *Greenpoint*.

In essence, Ballard asked Judge Halfenger—and asks this court—to ignore the existence of GAM II (and Chrysalis, for that matter), and to treat GAM II's individual, human managing member (Hull) as if he was a managing member of Greenpoint. It has asked both courts to ignore the law governing the existence and rights of limited liability corporate entities. Judge Halfenger did not err in refusing to do so, and Ballard's argument to him, and to his court, is contrary to the body of law that governs corporate entities.

Nor did Judge Halfenger err in observing that there is no evidence in the record that Hull was an "Indemnified Person" under the Greenpoint operating agreement. Without proof that Hull qualified as an "Indemnified Person" under that agreement, no reasonable trier of fact could conclude that the agreement entitled Hull to indemnification, and Judge Halfenger did not err in so finding.

Ballard argued to Judge Halfenger, and argues to this court, that the courts should construe Wis. Stat. §183.0403 to mandate Greenpoint's indemnification of Hull given the purpose of the statute and "longstanding equitable principles of common law." Dkt. No. 6 at 21-22. When interpreting a statute, the court "begins with the language of the statute, and, if the language is unambiguous, we apply the statute's plain language to the facts at hand." State v. Hemp, 359 Wis. 2d 320 (Wis. 2014). A statute is ambiguous if it "'is

64

capable of being understood by reasonably well-informed persons in two or more senses.'" Bank Mut. v. S.J. Boyer Const., Inc., 326 Wis. 2d 521, 535 (Wis. 2010) (quoting State ex rel. Kalal v. Circuit Court for Dane C'nty, 271 Wis. 2d 633, 663 (Wis. 2004)). "If a statute is ambiguous, we turn to extrinsic sources." Id.

Ballard has not argued that the statute is ambiguous. Rather, it implies that when the Wisconsin legislature used the words "member" and "manager(s)," it meant "person." It says that Hull was the *person* managing entity member GAM II, so Hull was the *person* managing Greenpoint. But that is not what the statute says. Had the legislature wanted to ensure indemnification of *people*, rather than entities, it could have said so. It did not. Had it wanted to define "member" or "manager" as a "person," it could have done so. It did not. And even if the statute said what Ballard wants the court to conclude it says, Ballard did not provide Judge Halfenger with evidence that Hull was, in fact, the human doing whatever "managing" was being done.

Nor does equitable indemnity apply. "Equitable indemnity is possible when one party is exposed to liability for the wrongful acts of another." Kriefall, 342 Wis. 2d at 56. Ballard has not asserted that Greenpoint exposed it to liability, nor did it provide proof to Judge Halfenger that Greenpoint exposed it to liability. There is no evidence that Greenpoint caused the investigations and arbitrations for which Ballard represented Hull.

The court will not reverse Judge Halfenger's conclusion that Hull was not entitled to indemnification by Greenpoint.

## IV.    Conclusion

The court **AFFIRMS** the bankruptcy court's grant of summary judgment

in favor of the Committee. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 9th day of June, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**